**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David Brian NEILL, Defendant–**
**Appellant.**

**No. 97–30383.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1998.

Opinion Filed Dec. 2, 1998.

Opinion Withdrawn Jan. 26, 1999.

Decided Jan. 26, 1999.

Howard Clyman, Lake Oswego, Oregon, for the defendant-appellant.

Michael W. Mosman, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

Before: THOMPSON and TROTT, Circuit Judges, and RHOADES,\* District Judge.

### ORDER

The Opinion filed in this case on December 2, 1998, is hereby WITHDRAWN. An Opinion of this appeal is filed with this order.

### OPINION

TROTT, Circuit Judge:

### I. Overview

David Brian Neill ("Neill") appeals his conviction by a jury and sentence for two counts of bank robbery. On appeal, Neill argues that the district court erred in (1) denying his motion in limine to exclude from evidence reference to the work release center where Neill had been housed, (2) denying his motions for acquittal, (3) granting the government's motion to amend the indictment, and (4) adjusting his sentence upward four levels for use of a dangerous weapon. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm both the sentence and the conviction.

\* The Honorable John S. Rhoades, Senior District Judge for the Southern District of California,

### II. Background

On May 14, 1997, Neill was indicted for two counts of bank robbery in violation of 18 U.S.C. § 2113(a). Count one charged Neill and his accomplice Dewayne Christiansen ("Christiansen") with robbing the Scio City Wells Fargo Bank on April 14, 1997. Count two charged them with robbing the Salem City Bank of Salem on April 4, 1997.

Both Neill and Christiansen had prior criminal records and at the time of the robberies were housed at the Marion County Work Release Center ("Work Release Center"). Before trial, Neill submitted a motion in limine asking the court to preclude any testimonial reference to the fact that Neill was housed at the Work Release Center. That motion was denied, and Neill was granted a continuing objection to each mention of the Work Release Center.

Twice during the trial, once at the end of the prosecution's case and once at the end of all the evidence, Neill moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Both motions were denied.

After the case was submitted to the jury, the jury sent a written question to the judge. That question pointed out a previously undiscovered error in the indictment. Count two of the indictment mistakenly stated that the money from the Bank of Salem was in the custody of the Wells Fargo Bank. The money stolen from the Bank of Salem was actually in the custody of the Bank of Salem. The judge raised this issue with the parties, and the United States moved to amend the indictment to conform to the facts. Neill objected and renewed his motion for acquittal on count two. The court denied Neill's motion and granted the United States's motion to amend the indictment.

The jury returned a verdict of guilty on both counts.

At sentencing, the government requested a four-level · increase in sentence under U.S.S.G. § 2B3.1(b)(2) (1997) for commission of a crime with a dangerous weapon. Neill

sitting by designation.

objected, arguing that the pepper spray used in the robberies did not constitute a dangerous weapon. After a hearing, the district court found that pepper spray constituted a dangerous 'weapon, denied Neill's objection, and sentenced Neill to 240 months for count one and 84 months for count two, to be served consecutively.

## III. Discussion

### A. Reference to Work Release Center

■ Neill challenges the district court's decision denying his motion in limine, and allowing witnesses and counsel to refer to the fact that Neill was on work release at the time of the bank robberies. Neill argues that the probative value of his work release status was substantially outweighed by its prejudicial effect and admission therefore violated Rule 403 of the Federal Rules of Evidence.

■ The district court's decision balancing the probative value of evidence against its prejudicial effect is reviewed for an abuse of discretion. *United States v. Cordoba*, 104 F.3d 225, 229 (9th Cir.1997). "The district judge is given wide latitude in determining the admissibility of evidence under this standard." *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir.1995).

We have not previously addressed the admissability of proof that a defendant was on work release status. However, we have looked at closely analogous situations. Specifically, we recognized the risks associated with allowing into evidence the fact that the defendant was on parole or in a halfway house. *See United States v. Manarite*, 44 F.3d 1407, 1418 (9th Cir.1995) (noting that evidence that defendant was on parole "should be considered evidence of other crimes for purposes of Rule 404(b)"); *United States v. Sims*, 617 F.2d 1371, 1378 (9th Cir.1980) (discussing the admissibility of the defendant's failure to return to a halfway house and holding that halfway house status is evidence of prior bad acts but that in that case admission was not prejudicial error); *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir.1977) (discussing the risks of allowing parole officers to testify in criminal tri-

als). Like admission of a parole officer's testimony or evidence that the defendant was in a halfway house, reference to the Work Release Center indirectly allowed into evidence the damaging fact that Neill had been convicted of a prior crime.

The United States argues that the evidence of work release was relevant because it showed that Christiansen and Neill knew each other, that Neill had checked out of the Work Release Center during the time in which the crime occurred and that when Neill returned to the Work Release Center that night he had money to pay off a fine he owed to the Work Release Center.

Neill admits that the records of the Work Release Center are relevant but argues as he did to the district court that the prejudice from admitting reference to the Work Release Center should at least have been minimized by calling the Work Release Center a "Residential Program." We agree. The facts that Neill knew Christiansen, that Neill was not at home during commission of the crimes, and had money to repay debts after the crimes could have been established while avoiding prejudicial reference to the Work Release Center by calling it a different name.

The government argues that it would have been difficult for witnesses to remember to refer to the Work Release Center as a residential program when testifying. This argument is wholly without merit. Although this may have constituted a slight burden upon some witness, that burden is clearly outweighed by the prejudicial effect of prior convictions. Even recognizing the district court's discretion, the decision to admit evidence that suggests prior criminal acts without any real probative value constitutes error. The prejudice associated with prior crimes substantially outweighed the witnesses's convenience in testifying. Therefore, we hold that the district court erred in allowing in testimony concerning Neill's work release status and in refusing to reduce the prejudice by instructing witnesses to refer to the Work Release Center as a Residential Program. Precedent for tailoring of terms to avoid a more prejudicial term exists and should have been adopted in this case. *See United States v. Abel*, 469 U.S. 45, 48, 105

S.Ct. 465, 83 L.Ed.2d 450 (1984) (allowing the court to require parties refer to "Aryan Brotherhood" as a "secret type of prison organization").

■ However, in this case, the error was harmless. The evidence connecting Neill to both bank robberies was overwhelming. In addition to inculpatory circumstantial evidence regarding cars, clothing and a hat used in the crimes and linked to the defendant, his confederate in both crimes, Christiansen, identified Neill as his partner. At the request of the F.B.I. Christiansen also placed a telephone call to Neill before Neill was in custody. The conversation was recorded, and the tape was played to the jury. On the tape, Christiansen told Neill that he had cased the target of their next bank robbery and was ready to proceed. Neill told Christiansen not to tell anyone of the crimes, because talking was not "good practice."

In addition to Christiansen's testimony, the prosecution introduced the testimony of Chrystal Vaughn. Vaughn was a friend of Neill and Christiansen's and assisted in the first robbery. Vaughn testified that she drove Neill's car to purchase pepper spray for him, wiped fingerprints off of the stolen get-away car, and received three hundred dollars for her efforts. She also produced a letter she received from Neill before trial, which offered to reward her if she would alter her grand jury testimony so that the evidence would not be "enough for a guilty verdict." This letter was admitted into evidence at trial.

Moreover, the prosecution also offered the testimony of Suzanne Abbot, who assisted Neill and Christiansen in the second robbery. Abbott testified that like Vaughn, she had purchased pepper spray for Neil, and knowingly drove the get-away car. Vaughn also testified that she received money for her part in the second robbery, and paid Vaughn for her part in the first robbery. Abbott received a letter from Neill asking her to fabricate an alibi for him to corroborate the bogus alibi he told the F.B.I.

At trial, Neill's previous crimes were not discussed, and the fact that Neill had prior convictions was not mentioned. Moreover, the district court gave instruction to the jurors during voir dire in order to eliminate any prejudice. As part of the jury voir dire, the district court told the jury that there would be evidence that Neill had been on work release, instructed the jury not to speculate on the nature of the crime and asked if any of the jurors would be unable to do that. Apparently, none of the jurors voiced any problem with this instruction.

Under these circumstances, and in light of the overwhelming evidence which reveals Neill's plot to obstruct justice, we are satisfied that the improper admission of prejudicial evidence was harmless.

### B. Amending the Indictment

■ Neill argues that the district court erred in granting the government's motion to amend count two of the indictment after the case had been submitted to the jury. The sufficiency of an indictment is reviewed de novo. *United States v. Henson,* 123 F.3d 1226, 1235 (9th Cir.1997). The decision to grant a motion to amend the indictment is also reviewed de novo. *See United States v. Lim,* 984 F.2d 331, 337 (9th Cir.1993).

■ The essential purpose of an indictment is to give the defendant "notice of the charge so that he can defend or plead his case adequately." *United States v. James,* 980 F.2d 1314, 1316 (9th Cir.1992). "Generally, failure of an indictment to detail each element of the charged offense constitutes a fatal defect." *Id.* at 1316. However, a minor or technical deficiency in the indictment will not cause reversal of a conviction absent prejudice to the defendant. *United States v. Normandeau,* 800 F.2d 953, 958 (9th Cir. 1986). Amendment of the indictment to fix typographical errors is appropriate as long as the error did not mislead the defendant. *United States v. Lim,* 984 F.2d 331, 337 (9th Cir.1993) (allowing the amendment of the citation of the charged crime).

■ In this case, both counts of the indictment charged Neill with bank robbery in violation of 18 U.S.C § 2113(a). Count one charged Neill with robbing the Wells Fargo Bank and alleged that the money was in the custody of the Wells Fargo Bank. Count two

charged Neill with robbing the Bank of Salem. However, the indictment mistakenly alleged that the money was "in the care, custody, control and management of the Wells Fargo Bank." The second count should have alleged that the money was in the control of the Bank of Salem.

This error went unrecognized by the government, Neill and his counsel, and the district court. The error was not discovered until the case had been submitted to the jury and the jury sent a written question to the district court asking if the Bank of Salem was owned by Wells Fargo.

Recognizing that amendment of indictments to correct typographical errors is permissible, Neill argues that in this case the amendment was prejudicial because it directly related to a material element of the charged offense. Neill's argument lacks merit. This court has previously allowed the amendment of an indictment even when the amendment related to an element of the offense charged. *See James,* 980 F.2d at 1318 (holding that the indictment was sufficient even though it did not allege that both the defendant and the victim were Indians); *United States v. Coleman,* 656 F.2d 509, 511 (9th Cir.1981) (holding that citation to 18 U.S.C. § 2113(a) cured the failure of the indictment to allege that the bank robbed was federally insured).

Amending the indictment was not error in this case. Like *Coleman,* the indictment in this case cited the statute under which Neill was charged. Citing to § 2113(a) makes clear the crime with which Neill was charged. It also enabled Neill to make a plea and prepare a defense. Neill knew he was being charged with robbing two federally insured banks. He even stipulated to the fact that both banks were federally insured on the days in which the robberies occurred. The error in the indictment would have gone unrecognized by all parties but for the careful reading of the indictment by the jury. Because Neill was clearly not prejudiced by the error, we hold that the district court did not err in allowing the indictment to be amended.

### C. Sufficiency of the Evidence

Neill argues that the district court erred in not granting his motions for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. A trial court's ruling on a motion for acquittal is reviewed de novo. *United States v. Tubiolo,* 134 F.3d 989, 991 (9th Cir.1998). Consequently, this court must review the evidence presented against the defendant in the light most favorable to the government to determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* at 991 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

During the hearing, Neill moved three times for acquittal under Rule 29: at the end of the prosecution's case, at the close of the evidence, and after the jury inquired about the mistake in the indictment. Neill argues that his motions for acquittal should have been granted as to count two because at the time he made his motions, there was no proof in the record that the money stolen from Wells Fargo Bank was federally insured. This argument stems from the error in the indictment. The only evidence in the record as to insurance was the stipulation entered into evidence which provided that the Bank of Salem was insured by the FDIC on April 4, 1997 and that the Wells Fargo Bank was FDIC insured on April 14, 1997. However, as explained above, count two of the indictment mistakenly charged that the Bank of Salem money was in the management of the Wells Fargo Bank on April 4, 1997. Consequently, Neill argues that because there was no evidence that Wells Fargo bank was FDIC insured on April 4, 1997, a reasonable jury could not have found all elements of the crime i.e., the money taken on April 4, 1997 was federally insured.

Neill's argument fails. The first two times Neill moved for acquittal, he did not offer any grounds for his motion. Only after the jury had noticed the error in the indictment did Neill state a ground for his Rule 29 motion. However, as explained above, at that time the district court correctly granted the government's motion to amend the indictment. Because we hold that amending the

indictment was not error, we also uphold that district court's decision denying Neill's motion for acquittal.

### D. Dangerous Weapon

 Finally, Neill argues that the pepper spray he used in robbing the banks was not a dangerous weapon and therefore the district court erred in applying a four-level increase in his sentence for use of a dangerous weapon. The legality of a guideline sentence is reviewed de novo. *United States v. Garcia*, 112 F.3d 395, 397 (9th Cir. 1997). However, the district court's factual findings in the sentencing phase are reviewed for clear error. *United States v. Ladum*, 141 F.3d 1328, 1344 (9th Cir.1998). The government has the burden of proving by a preponderance of the evidence the facts necessary to enhance a defendant's offense under the Guidelines. *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir.1994).

Section 2B3.1(b)(2)(D) (1997) of the Sentencing Guidelines provides for a four-level increase if a dangerous weapon is used in the commission of the crime. A dangerous weapon is "an instrument capable of inflicting death or serious bodily injury." *Id.* at § 1B1.1, cmt. (n.1(d)). A serious bodily injury is one "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* at (n.1(j)).

The issue of whether pepper spray constitutes a dangerous weapon has not been addressed by this court. Other courts have addressed similar issues with mixed results. *See United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir.1998) (holding that where mace did in fact cause serious injury it constituted a dangerous weapon); *United States v. Harris*, 44 F.3d 1206, 1216 (3d Cir.1995) (holding that the government failed to prove that mace constituted a dangerous weapon); *United States v. Dukovich*, 11 F.3d 140, 142 (11th Cir.1994) (holding that tear gas is a dangerous weapon because it can harm eyes, induce vomiting, cause loss of breath and leave rashes).

In the instant case, Neill offered testimony from Kenneth G. Heide, a twenty-five year police veteran. He testified that in his opinion pepper spray was not a dangerous weapon, and that in four years of investigating use of pepper spray by Eugene police officers, there was never an instance of injury. Neill also entered into evidence an article from the National Institute of Justice which provided that only 14 of 174 suspects sprayed with pepper spray suffered any injuries and those injuries were minor, requiring no hospital treatment.

The United States offered the testimony of Janet Williams, a loan secretary at the Salem Bank, who was sprayed in the face with pepper spray during the robbery. Before the incident, Williams suffered from exercise-induced asthma controllable with a inhaler after exercising. She testified that the pepper spray caused her to cough and choke and her eyes and nose to burn. Williams also testified that she suffered from severe asthma attacks for a week after the incident and was forced to go see a doctor. The doctor prescribed steroids to control Williams's severe asthma attacks. Williams testified that she continues to suffer from severe asthma brought on by the pepper spray and is required to take five asthma relief pills a day for the rest of her life. The United States argued and the district court agreed that, in this case, pepper spray caused serious bodily injury and was therefore a dangerous weapon.

The district court did not err. Evidence presented to the district court demonstrates that pepper spray is "capable of inflicting death or serious bodily injury" and therefore satisfies the requirements of a dangerous weapon as defined in § 2B3.1(b)(2)(D). Initially, evidence at trial proved that pepper spray is capable of causing "extreme pain." Williams testified that after being sprayed she felt "like somebody took a match and stuck it up both sides of [her] nostrils ... it was like I was on fire." Additionally, Williams's testimony proves that pepper spray is capable of causing "protracted impairment of a function of a bodily organ." Williams testified that "I was not able to breath, you know, no air in. A lot of cough-

ing mucus in—in my lungs. Its like your lungs are just being filled up slowly with liquid and you're not able to breathe in because there's no way for the air to come in." According to Williams, this condition lasted for days and did not completely abate for two weeks. As explained above, Williams testified that she is currently required to take five asthma relief pills a day for the rest of her life. Such lifelong severe asthma is surely a protracted impairment of a bodily organ, the lungs. Juxtaposed against Williams's compelling testimony, Heide's opinion carried little weight.

Because in this case, pepper spray caused extreme pain and prolonged impairment of a bodily organ, it satisfied the definition of a dangerous weapon, and the district court correctly adjusted the sentence. *See Bartolotta,* 153 F.3d at 879 (holding that mace constituted a dangerous weapon on almost identical facts and resulting injury); *Dukovich,* 11 F.3d at 142 (same). Given the factual record, we reject the claim that pepper spray cannot be a dangerous weapon.

### IV. Conclusion

For the foregoing reasons, we affirm Neill's conviction and sentence.

AFFIRMED.